**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

HALIE K. DOWNES,                  )
                               )
          Plaintiff,          )
                               )
v.                             )     No. 4:15-cv-00048-NKL
                               )
CAROLYN W. COLVIN,         )
Acting Commissioner of Social Security,  )
                               )
          Defendant.      )

## ORDER

Plaintiff Halie K. Downs appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits. The decision is reversed and the case is remanded for award of benefits.

## I.    Background

Downes was born in 1988. She alleges she became disabled beginning December 15, 2011, due to bipolar disorder, attention deficit hyperactivity disorder, depression, and anxiety with two prior suicide attempts.

Downes graduated from high school in 2008. She spent about 45% percent of her time in special education classrooms, for at least two years. Downes' individualized education plan notes included the observation that she tries to joke with her peers, but they did not follow, and that she was "very opinionated and confrontational," and acted "like she knew everything[.]" [Tr. 234.] Downes was administered an intelligence test in 2003, when she was about 15 years old. Her performance IQ was 83, and her full-scale IQ was 84.

### A.    Medical and opinion evidence

On June 13, 2011, Downes was admitted to the Labor and Delivery Department at Cox

Medical Center – South in Springfield, Missouri. She was 40 weeks pregnant and presented for induction secondary to the baby's possible pericardial and pleural effusion noted on a prior ultrasound. The baby was delivered stillborn on June 15, 2011. Downes was discharged two days later, with prescriptions for Percocet for pain and Vistaril for anxiety.

On November 4, 2011, Downes was having suicidal thoughts and went to the emergency room. She reported feeling "empty" and that she stayed in bed all day. [Tr. 422.] She said she had been more manic lately, fearing that that she would hit the "dark spot." [*Id.*] She reported drinking nine drinks per sitting about twice per week. She said that at age 16, she attempted suicide five times by drowning, overdose, and cutting. Nurse Marilyn Funn performed a psychiatric evaluation, and noted Downes had pressured speech and was very talkative with the ability to stay on topic.

Downes was transferred to Springfield Behavioral Health – Marian Center for inpatient treatment. Dr. Donald Balun performed a mental status examination. He noted that Downes was cooperative and casually dressed with adequate hygiene. Her speech was mild pressured, having to stop and be redirected. Her motor activity was mildly increased with excessive but not abnormal gesturing. Her affect was generally euthymic, with brief dysphoria while discussing the loss of her child. She was tearful at times, and over-explained her thoughts. She denied delusions, hallucinations, and suicidal or homicidal ideation. Her insight was poor with fair judgment. Dr. Balun assessed depressive disorder not otherwise specified, anxiety disorder not otherwise specified, bereavement, ADHD, cannabis use, rule out PTSD, and personality disorder not otherwise specified, with a Global Assessment of Functioning (GAF) score of 50. Downes was discharged two days later with a GAF of 60, and prescriptions for trazodone, Celexa, and hydroxyzine. Dr. Balun instructed Downes to follow up with a psychiatrist, therapist, primary

care physician, and specialty clinics.

On April 8, 2012, Downes went to Tri-County Mental Health Center for intake. She reported several symptoms, including anger, loss of interest, decreased appetite, excessive worrying, racing thoughts, excessive sleep, impulsivity, inattention, sleep issues, irritability, low self-esteem, sadness, thoughts of self-harm, tiredness, hopelessness, crying spells, social withdrawal, sexual problems, family conflict, anxiety, flashbacks, nightmares, hallucination, paranoia, temper tantrums, aggression, headaches, rapid heartbeat, stomachaches, weight concerns, and concerns about her appearance. She reported that she was seen for primary care by a Dr. Raskin, and that she took Lexapro and ibuprofen. Her goal for treatment was "fix me." [Tr. 327-28.]

On April 28, 2012, Downes went to the emergency room in moderate distress. She reported dark, racing thoughts. She wanted to go back on Lexapro, but had lost her job and insurance the month before. Social worker Melissa Calern noted no psychosis, but definite impulsivity and probable cluster-B traits. Upon mental status exam, Downes displayed an appropriate attitude and self-perception. Motor activity was hyperactive. Mood was euphoric, but affect was labile. She used pressured speech. She was oriented with circumstantial thought process. Her intelligence was estimated to be average. Insight and judgment were moderately impaired. Regarding her activities of daily living, Downes reported that she lived with her mother, slept during the day, stayed up all night, and had nightmares. She said she had no real friends. She also reported that she was raped after her son's death. She was discharged with a primary diagnosis of ADHD, and a prescription for escitalopram for depression and anxiety, at a dosage of 10 mg., to be doubled after one week. She was instructed to follow up with a mental health professional and referred to Tri-County Mental Health Services.

Downes completed intake at Tri-County on May 8, 2012 with Kerri Williams, LCSW. Downes relayed her story of the loss of her son. She also reported that in February 2012, her former friend held her hostage, assaulted her, and tried to kill her over a six-hour period. She reported that certain things triggered memories of this event, which made her upset and angry. She reported using alcohol once to twice per week, and occasionally using marijuana, but that she had cut back since joining the JobCorps program at school. She said that drinking made the voices and sounds go away. Upon mental status examination, Williams noted poor hygiene, agitative motor activity, poor concentration, fair attention, an anxious and dysphoric mood, and a labile affect. Downes' speech was excessive and her thought process was tangential. Williams estimated average intellect with fair insight and episodically impaired judgment, and diagnosed bipolar I disorder, most recent episode depressed, severe without psychotic features, PTSD, polysubstance dependence (alcohol and marijuana), and personality disorder not otherwise specified, with a GAF of 51-60. Williams recommended medication management with Mary Chance, APN and therapy with Esther McDonough, MSW, LCSW, LCAC to process grief and trauma and learn coping skills for mood management.

That same day, Downes saw McDonough. Downes had racing thoughts and reported, "I don't know how to control my mind." [Tr. 599-600.] McDonough assessed a GAF of 55.

On May 15, 2012, Downes attended her first therapy session with McDonough. Downes reported losing three jobs due to not changing her patients in the nursing home. Upon mental status examination, McDonough noted that Downes exhibited fluctuating alertness, restricted affect, elevated mood, fair eye contact, and rapid speech. Recent and remote memory were moderately impaired. Downes had difficulty remaining seated. Judgment was fair, with the ability to attend and maintain focus. Downes said she sometimes wants to die. McDonough's

impression was bipolar II disorder with rapid cycling and borderline personality disorder, with a GAF of 55. Downes' treatment plan included Dialectal Behavioral Therapy once per week, both individually and in group therapy.

The next day, Downes saw Mary Chance, APN for psychiatric evaluation, with chief complaints of depression and anxiety. Downes reported thinking that people were talking about her when entering a room. She self-identified as an alcoholic. Upon mental status examination, Chance noted Downes was pleasant and cooperative with clear thoughts and no apparent psychosis. Grooming and hygiene were fair. Downes had a bright, talkative affect and went into great detail about everything. Chance estimated her intelligence to be low average, and noted fair insight and judgment. Chance diagnosed mood disorder not otherwise specified, rule out bipolar II disorder, rule out major depressive disorder, polysubstance dependence, PTSD, and personality disorder by history. Chance assessed a GAF of 55; prescribed Celexa and Vistaril; instructed Downes to continue seeing McDonough; and encouraged a regular sleep pattern and exercise.

Downes returned to therapy with McDonough on May 21, 2012. They discussed Downes' son and her relationship with the baby's father. She reported sexual abuse and that she sees the predator at family functions. McDonough assessed bipolar II disorder with rapid cycling and borderline personality disorder with a GAF of 55.

Also on May 21, 2012, Downes met with Heather Hayes, M.S. to set up case management services. Downes reported wanting to have another baby. She also reported that she had a job interview with a home health agency where she could work full time. Hayes referred Downes to apply for Social Security, and noted Downes "cannot get organized enough to be successful long enough." [Tr. 315-16.]

On May 29, 2012, Downes attended individual DBT therapy with McDonough. She reported being able to identify mood dysregulation and "black and white" thinking. [Tr. 588-89.] The next day, Hayes followed up with Downes in her home to assist her with a Medicaid application. Downes was given the task of obtaining her family's income information.

Downes saw McDonough for individual therapy on June 7, 2012. Downes reported feeling stressed, having seen a special for "real life dolls" for mothers who had lost a child. McDonough assigned Downes homework in the form of taking two hours off from playing any roles.

Group therapy began June 13, 2012. At her initial group, Downes was engaged and reported that she hoped DBT would help "calm her mind down." [Tr. 343.] At subsequent group sessions, Downes was sometimes disruptive. [Tr. 345-46, 623-24.]

On June 13, 2012, Meghan Skaggs, B.S.W. met with Downes and Downes' boyfriend. Downes reported anxiety and that she had missed her DFS appointment as a result. She also reported that she was to start a new job that weekend.

At a June 26, 2012 visit with Skaggs, Downes easily became overwhelmed and reported feeling like she was going to have a panic attack as they were filling out some paperwork. Downs also reported getting angry with her boyfriend for not seriously treating their dog as a child. She also reported being afraid to use birth control because it would cause her deceased son's "soul to be lost forever" and that his soul is "waiting to get into [her] next baby." [Tr. 507.]

On July 5, 2012, Downes saw nurse-practitioner Chance for medication management. Her medications and therapy were continued.

On July 20, 2012, medical consultant Mark Altomari, Ph.D. reviewed Downes' medical

records and prepared a psychiatric review technique. [Tr. 66-69.] Based upon his review, he opined that Downes had a mild restriction in activities of daily living, moderate difficulty maintaining social functioning, and moderate difficulty maintaining concentration and pace with no episodes of decompensation. He also formed an opinion concerning Downes' mental RFC. He concluded that Downes retains the ability to understand, remember, and carry out simple instructions; maintain adequate attendance; sustain an ordinary routine without special supervision; interact adequately with peers and supervisors; and adapt to most usual change common to a competitive work setting.

In the Findings of Fact and Analysis of Evidence section of the report, Dr. Altomari noted Downes was diagnosed with "ADD in first grade and has been on meds for that in the past. She was diagnosed with Bipolar at age 17 by her [primary care physician], but has had minimal psychiatric treatment." [Tr. 65.] There is no mention of special education or intelligence testing.

From July to November 2012, Downes attended 12 more group therapy sessions and 14 individual therapy sessions up to November 2012. At the group therapy sessions, Downes had difficulty focusing; told stories with minimal relevance; and was at times disruptive. During that time, caseworker Skaggs continued to help Downes with disability and Medicaid paperwork, and community support. Skaggs' detailed progress notes of their sessions chronicle various difficulties Downes was having. For example, at a July 2012 visit, Downes was scattered. She said she wanted to watch TV all day "because they are her friends" but she also said she wanted to make friends. [Tr. 504.] At an August 2012 visit, Downes was distracted, had a hard time tracking her thoughts, and said she felt like she "doesn't exist and that is why [she] wants to cut." [Tr. 500.] At a visit later that month, Skaggs helped Downes fill out some paperwork for state benefits and fill out the envelope, and then had to walk with her to the mail box to mail it, due to

Downes' difficulties following through. [Tr. 499.] At a September 2012 visit with Skaggs, Downes was dressed in her nightclothes. [Tr. 498.]

In October 2012, Downes' mother reported that Downes had a meltdown over a car accident, and bought baby clothes to help cope. [Tr. 495-96.] Later that month, Skaggs saw that Downes' face was covered in scabs. Downes said she could not stop picking at her skin because she was nervous. Also, she reported she was meeting strangers online and having unprotected sex, because she wanted to get pregnant again. [Tr. 495.] She reported being excited about gaining eight pounds because she thought she might be pregnant, planned to take a pregnancy test, and thought she might move out of her mother's house and into her car with her dog, to show her mother she was responsible. [Tr. 494, 10/15/2012.] Downes' mother reported Downes had spent all her money on vampire contact lenses. [*Id.*] Later that month, Downes was upset about being fired from three jobs in the last two months, but was excited to have applied for and gotten a job at the "Dark Magic" store. [Tr. 493, 10/23/2102.] She was also manic and unfocused. [Tr. 493, 10/30/2012.]

At the beginning of November 2012, Downes told Skaggs she was having black-outs or episodes when she loses time. [Tr. 492-91, 11/2/2012 and 11/5/2012.] On November 7, 2012, Downes saw psychiatrist Zafar Mahmood, M.D. Downes reported that she could not focus, making her forgetful and disorganized. She also reported hearing voices and having occasional episodes of dissociation. She said she cut back on alcohol and marijuana. Upon mental status examination, Dr. Mahmood noted Downes was alert and oriented with a bright and cheerful affect. Her speech mildly pushed for a period. The doctor noted Downes appeared manic, and assessed bipolar II disorder, ADHD by history, and borderline personality disorder, with a GAF of 50. He prescribed Ritalin, and continued Celexa and Vistaril.

On November 9, 2012, after losing another job, Downes got drunk and drove her car off the road. She went to the emergency room. A mental status examination performed by psychiatrist Jaffri Syed, M.D. showed Downes had a fair appearance, was alert and oriented, and was cooperative. She was attentive with normal psychomotor activity. Her mood was euthymic and her affect appropriate. Dr. Syed assessed bipolar disorder, PTSD, ADHD, and borderline personality disorder with a GAF of 30, and Downes was admitted to the hospital. Kris Boyle, LCSW also noted Downes had auditory and visual hallucinations. That night, Downes called caseworker Skaggs five times. Skaggs came to visit Downes the next day, and the nurses had to urge Downes to wake up. Skaggs and Downes talked about the idea of Downes moving to a group home. Skaggs noted, "Halie appears to be struggling with basic functioning." [Tr. 488-89.] Downes was discharged on November 13, 2012. Her diagnoses included bipolar, PTSD, and ADHD by history, with a GAF of 40. Celexa, Seroquel, and Vistaril were prescribed.

After discharge, Downes continued individual and group therapy. On November 29, 2012, during a visit with Skaggs, Downes' thoughts were scattered. She compared her life to that of a vampire. [Tr. 485, 11/29/012.] In December 2012, Downes became upset during a phone call she made to Skaggs from a store parking lot, laid her cell phone on the pavement, and began banging her head against a wall. [Tr. 484, 12/4/2012.] She was also excited about volunteering to help runaway teens, but recognized she struggles to follow through [Tr. 483-84, 12/12/2012], and never did so. In December 2012, Downes reported that she feels more like herself when she is playing an online fantasy game than she does in real life. [Tr. 482, 1/7/2013.]

Downes followed up with Dr. Mahmood on January 14, 2013. Dr. Mahmood instructed Downes to re-start Ritalin and follow up in one month.

On March 21, 2013, Downes saw Kathleen King, Ph.D., for a consultative examination at the request of the state agency. [Tr. 636-40.] Dr. King's report states she interviewed Downes; there is no indication that Dr. King reviewed, or had available to her, any of Downes' records in preparing the report. The doctor assessed major depressive disorder, recurrent moderate; anxiety disorder not otherwise specified; adult attention deficit and hyperactivity disorder; and personality disorder not otherwise specified. Dr. King opined that Downes is capable of understanding and remembering simple instructions. She stated Downes' "attention and concentration are adequate in a quiet, one on one setting; she does not require any redirection." [Tr. 637.] She also opined that Downes' attention and concentration is adequate for repetitive tasks, but that persistence and pace would be "adversely affected by her psychological symptoms." [Tr. 638.] Dr. King opined that Downes would do better in situations with limited social interactions in order to maintain her concentration level.

Downes saw Dr. Mahmood on April 16, 2013, with complaints of depression, anxiety, mood lability, and inattention. Dr. Mahmood assessed major depressive disorder, recurrent moderate; PTSD; ADHD combined type; and personality disorder with borderline traits. He assessed a GAF of 50, and prescribed Celexa and Ritalin.

On April 22, 2013, caseworker Skaggs visited Downes. Downes was dirty. Skaggs noted that the appearance of the skin on Downes' face, arms, and chest was improved, suggesting less picking. But Downes told the therapist "with some shame" that there were areas under her clothes where she continued picking. [Tr. 648.]

At group therapy on April 24, 2013, Downes said she was "doing better." [Tr. 648.] The next day, April 25, 2013, Downes told caseworker Skaggs that she was having an online relationship with a married man, that she had to obey what he said or she would be punished, that

she would be moving to North Carolina to live with him as his slave, and that he would take care of her and pay for everything. [Tr. 648.] In May 2013, Downes told Skaggs she had broken up with her married boyfriend and was not doing well. [Tr. 645.] Downes' mother told Skaggs that Downes was failing her phlebotomy classes because she did not understand assignments, nor was Downes doing household chores. [*Id.*]

Downes was approved for Medicaid in April 2013.

### B.      The hearing

Downes testified that in 2008, while she was still in high school, she worked at a McDonald's. She could not work around customers, and was assigned to the grill. She trained to become a certified nursing assistant through Job Corps, which took several years. She has held several CNA jobs, but has been let go for saying inappropriate things, not being focused, and not taking and understanding directions. She last worked as a CNA in 2011 at N&R of Green Haven, earning about $6,000 in total. She also recently tried to take a phlebotomy course through Vocational Rehabilitation, but because of low scores and her appearance, it did not work out. She always has difficulty dealing with coworkers, supervisors, and the public.

Downes testified that she lives with her mother and father. She spends most time in her bedroom, and watches TV and plays a role-playing computer game. She goes out a few times a week for therapy or to go to the grocery store. Downes has had two car accidents, one when she was 16 and one when she was 22, because she was not paying attention.

Downes' casework, Meghan Skaggs, also testified. Skaggs has worked with her for over a year, and has had contact with her on a weekly basis on average. As a caseworker, Skaggs monitors Downes' mental health, and works with her on community resources and trying to achieve independent living. Skaggs testified that Downes has trouble staying on track, carrying

on a conversation without changing subjects, gets overwhelmed easily and loses her train of thought, and has difficulty following through. She said Downes wanted to be a phlebotomist, and took some classes, but became overwhelmed and did not pass. Skaggs reported that Downes lost several CNA jobs, and subsequently applied for three or four jobs a day through the Career Builder website for a period of a few months, but no one ever called her back. Skaggs also said Downes struggles with sleep pattern and hygiene, and becomes overwhelmed with bathing and brushing her teeth because she does not like the sensation of being clean.

A vocational expert testified that Downes' work at McDonald's qualified as fast food worker, SVP two, light, and when she switched to the grill, her work qualified as sandwich maker, SVP two, medium. The ALJ asked the vocational expert to consider such person with no exertional, physical, visual, sensory, or environmental limits. But the ALJ added limitations of never being expected to understand, remember or carry out detailed instructions; never being expected to exercise independent judgment regarding the nature of those duties, which should be low stress; no commission sales, piecework; never interacting with the general public; and up to occasional contact with coworkers and supervisors. The expert opined that such person could perform the job of sandwich maker, "although it would not be uncommon for some of those environments to require more than occasional interaction with coworkers or supervisors." [Tr. 58.] The expert opined that other jobs such person could perform, that exist in significant numbers in the national economy, included stubber, such as a person who works in the back of a retail establishment; a night cleaner; and a document preparer. If the limitation of being able to only occasionally understand, remember, and carry out simple instructions was added, the expert opined that there would not be jobs that would be considered competitive employment. Finally, the expert opined that a person of Downes' background, who had such limited insight that she

would offend-coworkers or supervisors and not be aware of her inappropriate conduct, at least once a month, would not be capable of maintaining employment after the first episode and a warning.  [Tr. 60.]

**C.      The ALJ's decision**

The ALJ found that Downes has severe impairments of attention deficit hyperactivity disorder; major depressive disorder; personality disorder; anxiety disorder; and history of drug and alcohol abuse.  [Tr. 21.]  The ALJ found Downes does not have any impairments or combination of impairments that meet or medically equal the criteria of Listing 12.04, affective disorders;  Listing 12.06, anxiety-related disorders;  or Listing 12.08, personality disorders. [Tr. 21-22.]

The ALJ gave Dr. Altomari's opinion great weight.  The ALJ did not expressly state how much weight was given Dr. King's opinion, but did state that the opinion "was consistent with [Dr. King's] findings on examination and with the other evidence contained in the record." [Tr. 29.]

The ALJ determined that Downes has the residual functional capacity to perform a full range of work at all exertional levels, with non-exertional limitations as follows:

> Claimant should never be expected to understand, remember, or carry out detailed instructions. Her job duties must be simple, repetitive, and routine in nature. Claimant should never be expected to exercise independent judgment regarding the nature of her job duties.  These duties should never require interaction with the public. However, claimant can have up to occasional contact with co-workers and with supervisors.  Job duties should be low stress in nature, here defined as no duties involving commission sales or piecework.

[Tr. 22.]

Finally, the ALJ concluded Downes has no past relevant work.  But based on the

testimony of the vocational expert, the ALJ found Downes can perform the requirements of representative occupations such as stubber, night cleaner, and document preparer, jobs that exist in significant numbers in the national economy. The ALJ therefore denied Downes' claim.

## II.    Discussion

Downes disputes the ALJ's conclusion that she does not meet any Listings, arguing that the ALJ's findings with respect to the Paragraph B criteria are not supported by substantial evidence on the record as a whole, and that she meets the Paragraph A and C criteria which the ALJ did not address.  Downes also argues that the RFC fails to account for her mental limitations related to borderline intellectual functioning, and therefore is not properly supported.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law."  *Byers v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions.  *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008).  "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Byers*, 687 at 915.

All medical opinion evidence, regardless of source, is weighed by examining the length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability of the opinion including medical signs and laboratory findings, consistency with the record as a whole, specialization of the medical source, and other factors such as the source's understanding of the disability programs.  20 C.F.R. § 404.1527; 20 C.F.R. § 404.927.

14

**A. The listings**

Step three of the sequential analysis requires the ALJ to determine whether the claimant qualifies for benefits based on the Listing of Impairments. 20 C.F.R. Part 404 Subpart P. Appx. 1. If the claimant's disabilities equal or exceed an impairment in the Listings, then the claimant is presumed unable to work, is awarded benefits without a determination of whether she actually can perform her own prior work or other work, and the case is over. *Lott v. Colvin,* 772 F.3d 546, 549 (8th Cir. 2014).

The mental disorders at issue here are 12.04, affective disorders; 12.06, anxiety-related disorders; and 12.08, personality disorders. Listings 12.04 and 12.06 include Paragraph A, B, and C criteria, while Listing 12.08 has only Paragraph A and B criteria. To meet a listing, a claimant must be found to satisfy the introductory portion of the listing, and both Paragraphs A and B (or A and C, when appropriate).

**1.     Paragraph B**

The Paragraph B criteria for Listings 12.04, 12.06, and 12.08 are the same. Paragraph B provides that the medically documented condition or deeply ingrained maladaptive behavior must result in at least two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration. Marked means more than moderate, but less than extreme. A limitation is marked, whether only one function or multiple functions are impaired, "as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Pt. A, 12.00.C (citing 20 C.F.R. §§ 404.1520a and 416.920a). Information about, or

documentation of, functional limitations can come from medical sources, as well as non-medical sources such as family members, or records of work evaluations. *Id.*

In concluding Downes did not meet the Paragraph B criteria, the ALJ relied on the July 2012 record review performed by Dr. Altomari, who opined that Downes had only mild restriction in activities of daily living; moderate difficulty maintaining social functioning; and moderate difficulty maintaining concentration and pace; and no episodes of decompensation. Dr. Altomari concluded Downes retains the ability to understand, remember, and carry out simple instructions; maintain adequate attendance; sustain an ordinary routine without special supervision; interact adequately with peers and supervisors; and adapt to most usual changes common to a competitive work setting.

Although Dr. Altomari's opinion was rendered after Downes' alleged onset date of December 15, 2011, the opinion preceded numerous incidents such as Downes' firing from at least three jobs; her skin-picking behavior; her development of a relationship with a married man as his sex slave; black-outs; auditory hallucinations; manic behaviors; and feeling more like herself when playing an online fantasy game than when occupied by everyday life. Dr. Altomari could not have considered those incidents, nor other such relevant, probative evidence developed after he rendered his opinion.

The ALJ nevertheless concluded Dr. Altomari's opinion was consistent with the record, noting Downes "does chores, feeds the dogs and takes them outside, reads and plays apps, goes shopping once a week, spends time with friends once or twice a week, can follow written instructions, can pay attention better with her medications, and handles stress okay in job situations." [Tr. 22.] But the ALJ picks and chooses from the record. For example, she states Downes does chores, but Downes' mother complained to caseworker Skaggs that Downes does

16

not do chores despite being asked and reminded to. Contrary to the ALJ's conclusion, there is

no indication that Downes "handles stress okay in job situations." Downes was fired at least

three times in the latter part of 2012, because she cannot remain focused, says inappropriate

things, and cannot take and understand directions. Skaggs, who had worked with Downes for

over a year and saw her on a weekly basis, explained at the hearing that Downes has trouble

staying on track and carrying on a conversation, gets overwhelmed easily, loses her train of

thought, and has trouble following through. Furthermore, the only persons with whom the

record indicates Downes visits outside the home are her therapists and her ex-boyfriend.

Downes' relationship with her ex-boyfriend does not demonstrate Downes' ability to engage in

positive social functioning. Downes at one time viewed her boy-friend as a stand-in father to her

dog and was upset when he would not act as such. Substantial evidence on the whole record

does not support the ALJ's finding with respect to the Paragraph B criteria.

Substantial evidence on the whole record *does* support the conclusion that Downes

satisfies the Paragraph B criteria. Activities of daily living include:

> [A]daptive activities such as cleaning, shopping, cooking, taking
> public transportation, paying bills, maintaining a residence, caring
> appropriately for … grooming and hygiene, using telephones and
> directories, and using a post office. In the context of [the
> claimant's] overall situation, we assess the quality of these
> activities by their independence, appropriateness, effectiveness,
> and sustainability. [The SSA] will determine the extent to which
> [the claimant is] capable of initiating and participating in activities
> independent of supervision or direction.
>
> [The SSA] do[es] not define "marked" by a specific number of
> different activities of daily living in which functioning is impaired,
> but by the nature and overall degree of interference with function.
> For example, if [the claimant] do[es] a wide range of activities of
> daily living, we may still find that [the claimant has] a marked
> limitation in … daily activities if [the claimant has] serious
> difficulty performing them without direct supervision, or in a

suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Pt. A, 12.00.C.1. Downes lies in bed and people have to try to get her up. She has serious difficulty taking care of her personal hygiene because she does not like the feeling of being clean. She may avoid eating even when hungry because she does not physically feel like making a meal for herself. She wants to watch television all day because the characters are her friends. She cannot carry out ideas or plans, like putting an application letter in her mailbox, or following up on a volunteer opportunity she was excited about. Downes does not live on her own but with her mother, who supported the idea of Downes moving into a group home. Downes is impulsive. For example, she once spent all her money on vampire contact lenses. She picks at her skin all over her body, causing scabs. Downes' caseworker observed that Downes struggled with basic functioning. Substantial evidence on the whole record shows Downes has marked restrictions in activities of daily living.

Social functioning refers to a claimant's:

> [C]apacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. [The claimant] may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. [The claimant] may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. [The SSA] also … consider[s] cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.
>
> [The SSA] do[es] not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by

Case 4:15-cv-00048-NKL   Document 18   Filed 11/02/15   Page 18 of 22

the nature and overall degree of interference with function. For example, if [the claimant is] highly antagonistic, uncooperative, or hostile but [is] tolerated by local storekeepers, [the SSA] may nevertheless find that [the claimant] ha[s] a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

*Id.* at C.2. The record shows Downes' tendency to use pressured speech and to be verbose, with the need to be redirected. She was frequently noted to have poor hygiene when out in public. She was confrontational and had difficulty interacting with her peers in high school. She could not stay on track in group therapy and was disruptive. Downes once had a meltdown in a public parking lot and banged her head on the wall outside a store. She established a relationship, online, with a married man in another state, with whom she was going to live as his sex slave, in the hope of becoming pregnant again. In the work setting, Downes was fired from a number of jobs because she said inappropriate things, as well as for lack of focus and inability to follow directions. Substantial evidence on the whole record shows Downes has marked restrictions in social functioning.

Concentration, persistence, or pace refers to a claimant's

[A]bility to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

***

[The SSA] do[es] not define "marked" by a specific number of tasks that [a claimant is] unable to complete, but by the nature and overall degree of interference with function. [A claimant] may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Deficiencies that are

apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if [a claimant] can complete many simple tasks, we may nevertheless find that [the claimant] ha[s] a marked limitation in concentration, persistence, or pace if [he or she] cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

*Id.* at C. 3. The record shows Downes has serious problems with concentration. She reported having racing thoughts, and auditory and visual hallucinations. Her mental health records reflect that Downes has poor concentration, a tangential thought process, difficulty focusing, and could be disruptive. As noted above, she was fired from a number of jobs for, among other reasons, lack of focus and inability to follow directions. Also as noted above, Downes has serious difficulty following through with plans or ideas. Substantial evidence on the whole record shows Downes has marked difficulties in maintaining concentration, persistence, or pace.

Downes meets the Paragraph B criteria of Listings 12.04, 12.06, and 12.08, in that she meets at least two of the four elements.

### 2.    Paragraph A

The ALJ did not mention the Paragraph A criteria for any of the three Listings. Downes argues she met the criteria for all three, and the Commissioner does not respond to that argument. The SSA regulations pertaining to mental disorders address Paragraph A as follows:

The criteria in paragraph A substantiate medically the presence of a particular mental disorder. Specific symptoms, signs, and laboratory findings in the paragraph A criteria of any of the listings in this section cannot be considered in isolation from the description of the mental disorder contained at the beginning of each listing category. Impairments should be analyzed or reviewed under the mental category(ies) indicated by the medical findings.

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, Pt. A, 12.00.A.   .

Listing 12.04 provides, in relevant part, that affective disorders are:

> Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> 1. Depressive syndrome characterized by at least four of the following:
> a. Anhedonia or pervasive loss of interest in almost all activities; or
> b. Appetite disturbance with change in weight; or
> c. Sleep disturbance; or
> d. Psychomotor agitation or retardation; or
> e. Decreased energy; or
> f. Feelings of guilt or worthlessness; or
> g. Difficulty concentrating or thinking; or
> h. Thoughts of suicide; or
> i. Hallucinations, delusions, or paranoid thinking[.]
>
> ***

*Id.*[1] As for the introductory paragraph, substantial evidence on the whole record demonstrates Downes has experienced depressive symptoms for years.

As for Paragraph A.1., the ALJ concluded at step 2, and the Commissioner does not dispute, that Downes has major depressive disorder, among other severe impairments. The diagnostic criteria for major depressive disorder are almost identical to the factors provided under Listing 12.04.A.1.a-h. *Major depression,* STEDMAN'S MEDICAL DICTIONARY 238320 (28th ed. 2005) (citing AM. PSYCH. ASSOC., DSM-IV-TR (2000)). Moreover, substantial evidence on the record as a whole reflects, at minimum, Downes' anhedonia, sleep disturbance, psychomotor

---

[1] In addition to subsection 1, relating to depressive syndrome, Paragraph A includes alternative subsections: 2, manic syndrome, and 3, bipolar syndrome. The Court need not decide whether Downes meets the alternative subsections.

agitation, decreased energy, difficulty concentrating or thinking, and thoughts of suicide, as well as hallucinations. The Court concludes Downes satisfies the Paragraph A criteria for Listing 12.04.

In view of the foregoing, Downes meets Listing 12.04, affective disorders. She is therefore presumed unable to work, shall be awarded benefits without a determination of whether she actually can perform her own prior work or other work, and the inquiry ends. The Court need not examine Listings 12.06 and 12.08, nor Downes' remaining argument concerning borderline intellectual functioning and support for the RFC.

III. **Conclusion**

The Commissioner's decision is reversed and benefits are awarded. The matter is remanded for further proceedings consistent with this Order.


<u>s/ Nanette K. Laughrey</u>
NANETTE K. LAUGHREY
United States District Judge

Dated: <u>November 2, 2015</u>
Jefferson City, Missouri